**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

NEW MEXICO GAS COMPANY,
PUBLIC SERVICE COMPANY OF NEW
MEXICO, and QWEST CORPORATION
d/b/a CENTURYLINK,

        Plaintiffs,

        v.                                       Civil No. 14-00188 WJ-KBM

BOARD OF COUNTY COMMISSIONERS
OF BERNALILLO COUNTY, NEW
MEXICO,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNT II**

THIS MATTER comes before the Court upon a Motion for Summary Judgment on Count II of Plaintiff's Complaint, filed by Defendant Board of County Commissioners of Bernalillo County, New Mexico ("Defendant" or "County") on December 29, 2017 **(Doc. 142)**. Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendant's motion is well-taken and, therefore, is granted.

## BACKGROUND

### I.      Procedural Background

Plaintiffs New Mexico Gas Company ("NMGC"), Public Service Company of New Mexico ("PNM") and Qwest Corporation d/b/a CenturyLink filed this lawsuit challenging the "Taxpayer Protection and Right-of-Way Ordinance" and related fee resolutions adopted by the County which require utilities to enter into right-of-way use agreements and to pay right-of-way

use fees. In this summary judgment motion, the County seeks a ruling that the Ordinance and Resolution are lawful and enforceable.

Based on this Court's previous rulings, Count II is the only remaining claim in this case, and is asserted only by Plaintiff CenturyLink[1] ("Plaintiff" or "CenturyLink"). The state law claims in this case were dismissed without prejudice under 28 U.S.C. §1367(c)(1) and (2). Doc. 42 at 12.[2] The complaint was then amended to conform to the Court's rulings, to include only two counts, both of which are federal claims: Count I of the Second Amended Complaint (Doc. 45) seeking a declaration that the Ordinance is unconstitutionally vague and violates due process under 42 U.S.C. §1983; and Count II in which CenturyLink seeks a declaration that the Ordinance and Resolutions violate 47 U.S.C. §253 and are therefore preempted by the Supremacy Clause of the United States Constitution. Doc. 45 (Sec. Am. Compl.). On September 12, 2014, the Court denied Plaintiffs' Motion for Judgment on the Pleadings as to Count I of the Second Amended Complaint, and subsequently granted Defendant's motion for the same. *See* Docs. 60 & 81.

The "Taxpayer Protection and Right-of-Way Ordinance" ("Ordinance" or "Bernalillo County Ordinance") and related fee resolutions ("Resolutions") were adopted by the County in 2014. The Ordinance requires utilities with facilities and equipment in the public right-of-way in unincorporated areas of Bernalillo County to execute a Right-of-Way Use Agreement with the County and, as part of such agreement, to pay a right-of-way use fee as provided in such Agreement. CenturyLink claims that the intended fee, or "franchise fee," has the effect of

---

[1] In previous pleadings, Plaintiff Qwest Corporation d/b/a CenturyLink was referred to as "Qwest"; however, in the most recent round of briefing, this named Plaintiff simply referred to itself as "CenturyLink."

[2] The three named Plaintiffs subsequently reasserted those claims in the Second Judicial District Court of the State of New Mexico, . *New Mexico Gas Co. et al. v. Bd. of Cnty. Comm'rs of Bernalillo Cnty*., Case No. D-202-CV-2014-05194 ("State Court Action"). *See* Doc. 131 at 2 (Order Denying Motion for Stay by Plaintiff Century Link Pending Resolution of State Court Claims). These claims are pending in state court, where it appears settlement facilitation may be occurring according to the state court docket.

prohibiting CenturyLink from providing its telecommunications service and therefore violates §253 because the intended fee will limit CenturyLink's investment in infrastructure and will restrict its ability to provide competitive services.[3]

CenturyLink's position in Count II is that the County may only charge a fee designed to recoup costs incurred in the administrative act of granting a franchise, and it alleges that the County has not performed a cost study to assess those costs. Sec. Am. Compl. (Doc. No. 45), ¶ 53. Plaintiff also complains of a "massive increase" in fees, alleging unfettered discretion" and "onerous non-fee provisions" imposed by the County, *id.,* §57, 62-63, and seeks an order from the Court enjoining the County from enforcing against Plaintiffs the fee and related provisions of the Ordinance and the Resolutions. The Second Amended Complaint seeks a declaration that the Ordinance and Resolutions are unlawful under §253 and are therefore unenforceable.

Defendant counters that §253 does not limit the County to recouping only limited costs incurred in granting a franchise, and also denies that it has "massively increased" the right-of-way use fee. Rather, it points out that it has properly imposed such a fee for the first time, and that this fee is based on a thorough cost study, allocated according to the extent users occupy the rights-of way. The County also claims that the fee amount is consistent with (or lower than) fees charged by at least one other governmental entity, giving the City of Albuquerque as one such example. The County disagrees with Plaintiff that the Ordinance materially inhibits its ability to provide services, and even so, the Ordinance falls within the safe harbor of §253(c) because the County is properly exercising its right to manage the public right-of-way and the fee seeks fair and reasonable compensation on a competitively neutral nondiscriminatory basis.

---

[3] Parties refer to the fee imposed on the County as a "use fee," "right-of-way fee" and "franchise fee" and so these terms are used interchangeably to refer to the fee imposed under the Ordinance.

Federal jurisdiction over Count II of the Second Amended Complaint is proper, as the claim is alleged as a challenge under the Supremacy Clause. *See Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1266 (10th Cir. 2004) ("*Santa Fe II")* ("a party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action").[4]

## II.    Facts[5]

The Court includes both parties' facts in this section, noting where factual disputes exist, if any. The Court also omits reference to supporting exhibits except where necessary, since they are included in the parties' briefs, and will also omit facts which are not material or relevant.

### A.    Century Link: Background and Use of Public Right-of-Way

CenturyLink is the incumbent local exchange carrier ("ILEC") in parts of New Mexico, including the unincorporated portion of Bernalillo County. The services provided by CenturyLink and its predecessors date back to 1911, which predates statehood. CenturyLink provides local

---

[4] In *Santa Fe II,* the Tenth Circuit distinguished between a claim brought under the Supremacy Clause and a statutory right of action, 380 F.3d at 1266, and affirmed the district court's ruling in *Santa Fe I* that there was no congressional intent to create a federal right of action for carriers through §253. *Id.* (affirming in part district court's ruling in *Qwest Corp. v. City of Santa Fe, New Mexico*, 224 F. Supp. 2d 1305 (D.N.M. 2002), aff'd in part, remanded in part, 380 F.3d 1258, 1325 (10th Cir. 2004) (*Santa Fe* I). Count II in this case asserts only a challenge to the Supremacy Clause, over which this Court has jurisdiction.    There has been a long and contentious litigation history between Qwest, now CenturyLink, and the City of Santa Fe involving different city ordinances.

[5]    For example, Plaintiff's statement that the franchise fees are a "form of indirect taxation by the municipalities, with CenturyLink serving as the tax collector" is not material to the issues raised in the summary judgment motion, and the Court agrees with Defendant that it is less of a fact and more of a rather speculative legal conclusion. *See* Doc. 145 at 10, Pltff's Add'l Fact AA. Plaintiff also states that the County's actions should be expected to be followed by other counties in the state, since Bernalillo County is the largest county in the state. *See* Doc. 145 at 12, Pltff's Add'l Fact SS. This "fact" will be omitted here because it an opinion rather than a fact, and is irrelevant to the §253 analysis before the Court.

  The Court also agrees with Defendant that many of Plaintiff's Additional Facts are relevant to the §253 analysis and so will be excluded from the factual narrative. For example, Plaintiff's Additional Fact Q states that other competitive local exchange carriers ("CLECs") lease facilities or access from CenturyLink that are located in the public ROW, and yet they are not subject to use fees. This fact is not disputed but Defendant notes that while some entities that lease facilities from CenturyLink may not be responsible for paying right-of-way fees directly to a government entity, CenturyLink could certainly take those lease fees into account when paying the right-of-way fees to the County. At any rate, what these other CLECs actually pay or do not pay has no bearing on the issue here.

exchange service, long distance service, high speed Internet service, data services and managed services.

CenturyLink has approximately 14,575 customers in the unincorporated portions of Bernalillo County. CenturyLink's telecommunications services benefit and contribute to the health, safety and quality of life of the residents in the unincorporated areas of the County. The County receives benefits from CenturyLink's services in the form of increased property values, economic development, property taxes and gross receipts tax revenues, among other benefits.

As a wireline carrier, CenturyLink locates portions of its network facilities in the public right-of-way, including portions managed by the County. CenturyLink's facilities in the public right-of-way include: telephone poles and the telephone wires and cables that are installed on these poles as well as on the poles installed by other utilities; cables and wires that are buried in the public right-of-way, usually alongside roadways; and pedestals and cross-boxes that are often seen adjacent to roadways.

Historically, CenturyLink installed and maintained its cables and wires mostly on poles. More recent techniques, including trenching and directional boring, have allowed CenturyLink to efficiently migrate much of its network below-ground, without disturbing roads and the facilities of other utilities in the public right-of-way. Trenching and directional boring have become so commonplace that CenturyLink has not cut into the pavement of a road in unincorporated Bernalillo County in at least the past five years. However, as Defendant notes, these new techniques do not change the fact that CenturyLink still continues to occupy public rights-of-way, even with some of its network below-ground. It would be impractical, and in some cases impossible, for CenturyLink to provide services without access to the public right-of-way in the unincorporated areas of the County.

B.    Use of Public Right-of-Way by CenturyLink's Competitors

CenturyLink's competitors include wireless carriers, competitive local exchange carriers ("CLECs"), voice-over-Internet-protocol ("VOIP") carriers, and cable television companies.   The term "competitive local exchange carrier"  comes from the 1996 Telecom Act to describe a wireline competitive provider that competes with an ILEC provider such as CenturyLink. Wireless carriers transmit and receive voice or data without the use of wires between the end user's handset and the wireless antenna located on a cell tower. Wireless carriers and resale providers generally use a wireline provider like CenturyLink for transporting their customers' calls and data between towers.  Defendant adds that CenturyLink receives compensation from its wireless competitors for this service.

Use of the public right-of-way by a wireless carrier is minimal and such carriers are generally not subject to right-of-way fees.  Conversely, wireless companies that do make use of public rights-of-way would be subject to the Ordinance, while wireline competitors that do not use public rights-of-way would not be required to pay fees under the Ordinance.  Some CLECs place facilities in the public right of way, which are called "facilities-based CLECs." They are subject to public right-of-way fees.  Other CLECs, termed "resale CLECs," lease facilities or access from CenturyLink that are located in the public right-of-way, and they are not subject to public right-of-way fees. Defendant points out that while entities lease facilities from CenturyLink may not be responsible for paying right-of-way use fees directly to the respective governmental entity, the lease fees paid to CenturyLink could take into account the right-of-way use fees paid by CenturyLink.

VOIP providers transmit voice service over the Internet using the Internet Protocol. There are approximately 117 VOIP providers in New Mexico (including Vonage, Ooma, and Magic

6

Jack). A VOIP user needs an Internet connection, but a VOIP provider usually does not provide the Internet connection. These VOIP providers are therefore not subject to public right-of-way fees. Comcast is the cable television company in the County. It also provides Internet access service and VOIP service. Comcast pays a franchise fee to the County of 5% of revenues from video services. However, Comcast is not required to pay the separate public right-of-way fee that is the subject of this litigation because federal law prohibits franchising authorities from imposing franchise fees on broadband or VOIP revenue.[6]

CenturyLink states that since the 1996 Telecom Act and the advent of competition, CenturyLink has lost substantial market share to competitors, particularly wireless companies. CenturyLink now has less than half of the number of "access lines" (meaning live connections to customers) as it did in 2001. During this period, the number of New Mexico households with voice service has remained relatively steady. As of 2016, 53.8% of New Mexico adults over the age of 18 have "cut the cord" and use only wireless for voice service. Defendant does not dispute these facts but relies on the opinion of its expert, William Fitzsimmons, Ph.D., to point out that a decrease in the number of customers does not necessarily translate into a decrease in profitability.

C.    CenturyLink's Public Right-of-Way Fees in New Mexico

CenturyLink states that its fees for use of the public right-of-way in New Mexico differ between municipalities and counties (Add'l Fact Y), but Defendant disputes this fact to the extent that it infers that municipalities and counties should be treated differently in considering §253, and the Court agrees that such an inference is not permitted by the statute.

Most of the municipalities in which CenturyLink provides service impose an annual franchise fee. The annual franchise fee is based on a percentage of revenues derived from certain

---

[6] Whether or not VOIP carriers are required to pay franchise fees is immaterial to the issues raised in Defendant's motion, but the Court provides these facts here as background information.

of CenturyLink's telecommunications services. Since the advent of competition, CenturyLink has resisted efforts by municipalities to increase these franchise fees. CenturyLink has twice challenged efforts by the City of Santa Fe to increase its franchise fee, and each time CenturyLink prevailed.

Century Link claims that in contrast to municipalities, no county in New Mexico has imposed a franchise fee or other annual fee on CenturyLink. Instead, the Counties generally impose permit fees. The permit fees are not annual fees, but instead are imposed each time a utility accesses the public right-of-way. Permit fees are not based on a percentage-of-revenues, but instead are designed to recover the County's costs for administering and supervising the specific activity. Defendant objects to Plaintiff's inference that permit fees are a substitute for franchise fees. According to its records, the average amount of permit fees that CenturyLink has paid the County for 2015, 2016, and the first six months of 2017 is less than $15,000 annually.

D.     County's Design Review Fee Resolution

On August 13, 2013, the Board of County Commissioners of Bernalillo County ("the Board") adopted, on a three to two vote, the Design Fee Resolution, which imposes a $750 fee for the design review of utility construction drawings where construction costs were under $250,000, and a fee of 1.5% of the construction costs for costs over $250,000.

E.     The Ordinance

On January 28, 2014, the County enacted its Taxpayer Protection and Right of Way Use Ordinance. *See* Ex. A to Sec. Am. Compl., Doc. 45). The Ordinance notes that the County "owns, maintains, and/or is responsible for its roadways, easements, and rights-of-way within the unincorporated areas of the County" and states that the County must be "compensated for the reasonable costs involved in the use of the right-of-way, for administrative expenses incurred in

the processing of the necessary permits, as well as for the required monitoring of the progress of work and protection of the public health, safety and welfare." *Id.,* section 1.3. The Ordinance requires that any person including business entities, such as CenturyLink, currently using the public right-of-way must pay an annual "use fee" to the County for the "use and occupancy" of the public right-of-way.

According to the Ordinance, the Board requires parties wishing to use County right-of-way to execute right-of-way use agreements which will include provisions requiring payment of an annual use fee. Those utilities wishing to obtain a right-of-way use agreement would be required to submit certain information (including identifying information, a statement of the purpose for the use of the right-of-way, a drawing of the location and dimensions of the proposed use, the method by which the proposed use will be accomplished, a map or schematic of utility systems currently occupying the right-of-way, and proof of membership in the New Mexico One Call system) (collectively referred to as "non-fee" provisions). The Ordinance further requires entities wishing to occupy public rights-of-way to submit proof of adequate insurance, and to agree to indemnify "the county and its officers, agents and employees, against all claims, losses and damages to person or property on account of or resulting from the intentional or negligent conduct on the part of the person's use of the County right-of-way, or any work, duties, or obligations performed pursuant to the terms of [the] Ordinance." The applications are reviewed by the County, which reserves the right to deny applications or proposed uses of the rights-of-way, or to impose appropriate terms and conditions.

To support passage of the Ordinance and to calculate the annual franchise fee to be charged the public right-of-way occupants, the County initially prepared a Financial Analysis Form dated January 28, 2014 ("FAF"). The FAF set out total annual costs purportedly incurred by the County

of about $6.8 million. The FAF was based on a single-page cost study performed by County personnel. CenturyLink contends that the FAF did not include an allocation of these costs among users of the public right-of-way, so there was no way for an occupant to know for what share it would be responsible. Defendant does not dispute that the FAF did not allocate costs among users of the public rights-of-way because it was only a preliminary analysis not meant to allocate fees to be charged each user of the rights-of-way under the Ordinance.

F.    The Cost Study

To calculate the annual-use fees contemplated by the Ordinance, the County performed a cost study to determine the costs it incurs in managing and maintaining its public rights of way. The study is based on the costs actually incurred by the County in 2013 in managing and maintaining the public rights of way, but is designed to reflect the County's ongoing costs of managing and maintaining the public rights of way. The County intends to allocate the costs calculated through the cost study to different users of the public rights of way based on their actual, physical, cubic-foot occupation of the right-of-way. The 2013 Cost Study identifies three categories. The first category, entitled "Operating Expenses," calculates annual costs at almost $15,000.00. This category includes costs for County departments that perform activities "directly" related to the public right-of-way. The second category is entitled "Depreciation Expenses," calculated at an annual cost of $9,384.896; and the third category is for "Interest Costs Allocated to [public right-of-way] Assets" which reflect interest on borrowings for public rights-of-way assets. The total annual costs calculated for these three categories for "owning, maintaining and managing" the public rights-of-way is over $27.3 million. CenturyLink makes the observation that the 2013 County budget indicates that the budget for its General Fund was $230 million, making the alleged public right-of-way costs more than 10% of all General Fund expenditures.

*See* Ex. 12. Defendant contends that Plaintiff's perspective regarding the percentage right-of-way costs make up of its general fund expenditures (which is used for recurring revenue and expenditure items) is not material, and adds that the exhibit relied on by CenturyLink (Ex. 12) states that the *total* County budget for 2013 was $520,607,863—which would lead to a much lower percentage result.

CenturyLink claims that the first category for "operating expenses" includes costs for County departments that have no responsibility for managing the utilities' use of the public rights-of-way such as the Sheriff's Department, the Fire Department and the Parks Department, but the Court agrees with Defendant that CenturyLink's contention is not supported by the cost study exhibit. Ex. 1 to Ex. 5 (Doc. 145-5). The subcategories under this category include "Vehicles," "Buildings" and "General Support Department." *Id.* There is no basis for Plaintiff's statement that the cost study includes departments "that have no responsibility for managing the utilities' use of the [public rights-of-way] . . . ." Plaintiff also claims that the category of "depreciation expenses" reflects the depreciation on public right-of-way assets such as roads and bridges, but the cost study does not support that claim either. The Court therefore considers these facts as immaterial and that CenturyLink has failed to create a dispute of fact regarding the County's cost study.

Relying on the cost study done by the County's consultants, the County's preliminary cost allocation estimates the annual fee to be charged CenturyLink pursuant to the Ordinance as $212,783.00. Ex. 4. Although CenturyLink does not currently pay the County any use fee for its occupation of the public rights of way, it does pay other government entities varying fees for use and occupation of public-rights of way. For example, in 2013 CenturyLink paid the City of Albuquerque ("City") $1,898,381.03 in franchise fee payments. The franchise fee was based on an agreed rate of 3.0% of "defined" CenturyLink revenue which was calculated on CenturyLink

gross receipts attributable to the City of Albuquerque of roughly $115,000,000.00 ($115 million). These fees are calculated on specifically defined CenturyLink telephone revenues as set out in the franchise ordinance between CenturyLink and the City. *See* Ex. E. For example, CenturyLink's internet and resale revenue, and telephone revenue not specified in that ordinance are not used to calculate the franchise fee it pays the City of Albuquerque. Put another way, the franchise-fee payments to the City equate to approximately 1.65% of CenturyLink's *total* Albuquerque gross receipts.

CenturyLink's reported gross receipts from the County in 2013 were $17,563,044.00. These gross receipts, if multiplied by 1.65% (the calculated percentage for Albuquerque based on total reported gross receipts and total paid franchise fees), would equate to a franchise-fee payment of $289,790.23. If the County's use fees were determined on the same basis as the City of Albuquerque's franchise fee (that is, specifically defined revenue), then the fee due to the County for 2013 would have been approximately $336,430.27 ($11,214,342.43 x 3% = $336,430.27). The County provides these calculations and facts (Facts 16-19 and 22-23) to show that CenturyLink's franchise fees to the City of Albuquerque—roughly $1,898,381.03—is much larger than the fees it would pay the County under the Ordinance.

CenturyLink disputes some of these facts. For example, CenturyLink notes that the cost study considered more than the costs related directly to the utilities' use of those rights-of-way, and takes into account the cost of the County's ownership, management and maintenance of the public . Ex. 6, ¶44. CenturyLink also criticizes the fact that the cost study was designed to reflect the County's "ongoing" costs, but was actually limited to one year, failing to account for varying costs in past and future years. (Resp. to Facts 9 & 10). In its response to Defendant's Facts 11

and 12, CenturyLink also challenges the methodology used by the County to calculate the preliminary cost allocation of $212,783.00.

G.    County's Agreements With Other Entities (Deft's Additional Undisputed Facts)

The County has agreements with multiple entities governing use and occupation of County rights-of-way, most of them executed before the County enacted the Ordinance which is the subject of this litigation. *See* Miglio Decl., Ex. H, ¶¶5-7 and Ex. 1 attached thereto. Some of those agreements require users of the rights-of-way to pay the County a fee calculated as a percentage of defined revenues and have generated fees significantly greater than the fee the County contemplates charging CenturyLink under the Ordinance. *Id.,* ¶¶10, 12. For example, under its agreement with the County, the Albuquerque Bernalillo County Water Utility Authority pays the County 4% of gross revenues in the unincorporated areas of the County, and Comcast currently pays to the County a fee in the amount of 5% of its gross revenues. The only agreement concerning use and occupation of the rights-of-way that has been executed since enactment of the Ordinance is a 2017 agreement with EMW Gas Association ("EMW"), and that agreement includes a fee calculation tied to the extent of EMW's occupation of the rights-of-way. *Id.,* ¶¶10, 12, 13, 14.

III.    **Legal Standard and Relevant Law**

A party seeking summary judgment bears the initial burden of showing that there is no genuine dispute as to a material fact. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998). A motion for summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also MediaNews Grp., Inc. v. McCarthey*, 494 F.3d 1254, 1261 (10th Cir. 2007) (summary judgment is appropriate when, construing the record in the light most

favorable to the non-moving party, "there is no genuine issue of material fact and one party is entitled to judgment as a matter of law."). A fact is material if it could have an effect on the outcome of the case. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the non-moving party. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).

The Telecommunications Act of 1996 was enacted by Congress "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996), codified at 47 U.S.C. §253. The statute serves that purpose by preempting state and local regulations that have a prohibitive effect on the provision of telecommunication services:

> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

47 U.S.C. § 253(a).

A federal statute preempts a local ordinance when Congress expresses a clear intent to do so. *RT Communications, Inc. v. FCC,* 201 F.3d 1264, 1269 (10th Cir.2000). 47 U.S.C. § 253 contains a clear expression by Congress of an intent to preempt local ordinances which prohibit the provision of telecommunications services. *Id.* Section 253(c) preserves the power of municipal authorities to manage rights-of-way and to require compensation for the use of the rights-of-way. 47 U.S.C. § 253(c). *Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1269 (10th Cir. 2004). The determination of whether a regulation is preempted by § 253 entails a two-step analysis:

> (1) First, it must be determined whether the state or local provision in question is prohibitive in effect under §253(a). If the provision is not prohibitive, there is no

prek
preemption under § 253. A regulation need not erect an absolute barrier to entry in order to be found prohibitive. *RT Communications,* 201 F.3d at 1268–69;

(2) If a regulation is prohibitive, the second part of the test is applied: the regulation may be saved from preemption if the local government meets its burden to show that the regulation fits within the requirements of § 253(c); that is, that the fees are fair and reasonable under 253(c) (referred to as the "safe harbor" provision) from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis. 47 U.S.C.A. § 253 (West).

*See Qwest Corp. v. City of Santa Fe, New Mexico*, 380 F.3d 1258, 1271 (10th Cir. 2004) (*Santa Fe II*). Thus, a plaintiff must prove that it has the effect of prohibiting its provision of telecommunications service, while local government has the burden of demonstrating that the regulation in question comes under the protection of §253(c). *Id.* ("The city has the burden of demonstrating that the discretionary provisions serve the purpose of allowing it to manage the public rights-of-way . . . ."). Only after the plaintiff sustains its burden of showing a violation of §253(a) by formally or effectively prohibiting entry into the telecommunications services market does the burden of proving that the regulation comes within the safe harbor in Section 253(c) fall on the defendant municipality. In other words, if the provision is not prohibitive, there is no preemption under § 253. *See Sprint Telephony PCS v. County of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008) (plaintiff must satisfy burden under §253(a) before local government has burden under §253(c). Further, the plaintiff must show actual or effective prohibition rather than the mere possibility of prohibition. *See Level 3 Communications, LLC v. City of St. Louis*, 477 F.3d 528, 532 (8th Cir. 2006); *Sprint Telephony PCS v. County of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008) ("a plaintiff suing a municipality under section 253(a) must show actual or effective prohibition, rather than the mere possibility of prohibition").

The County contends that the Ordinance and related Resolutions will not materially inhibit CenturyLink's provision of services, and in any event are a proper exercise of the County's

authority to manage the public rights-of-way and to require fair and reasonable compensation from telecommunications providers on a competitively neutral and nondiscriminatory basis.

## DISCUSSION

## I.    Whether Ordinance/Resolutions Materially Inhibit Provision of Services

The first part of the preemption inquiry under §253(a) requires that the plaintiff must prove that the ordinance or regulation has the effect of prohibiting its provision of telecommunications service.

### A.    Fee Provisions

The Court first addresses a threshold argument. Parties disagree as to whether a carrier must identify the *specific* service it would not be able to provide in order to show the prohibitive effect of the Ordinance and Resolutions.  The County claims that specificity is required, while Plaintiff disagrees. The law favors Plaintiff on this argument. The appropriate measure for prohibitive effect is the "overall impact" of an ordinance or regulation rather than its impact on a specific service.  *See Qwest Corp. v. City of Santa Fe,* Case No. 10cv00617-RB/KLM ("*Santa Fe III*") submitted as Doc. 40-1 at 32 in this case) (rejecting city's argument that ordinance was not prohibitive because it did not inhibit the provision of a specific service).  Further, under Tenth Circuit law, "a regulation need not erect an absolute barrier to entry in order to be found prohibitive." *RT Communications, Inc. v. F.C.C.,* 201 F.3d 1264, 1268 (10th Cir. 2000) ("Nowhere does the statute require that a bar to entry be insurmountable. . .").[7]

It is undisputed that this is the first imposition of a *franchise* fee imposed on CenturyLink by the County.  The County's imposition of this fee in itself is not considered prohibitory under §253, nor is every increase in costs a prohibition.  *See Santa Fe II,* 380 F.3d at 1269, 1271 ("[t]he

---

[7] In its reply, Defendant retreats from espousing the specificity requirement, acknowledging that it "may not be an absolute requirement."  Doc. 148 at 11, n.2.

mere naked requirement of a registration or lease with the city is not prohibitive within the meaning of the statute). *Santa Fe II,* 380 F.3d at 1269. The only question for an inquiry under §253(a) is whether the fee effectively prohibits CenturyLink from providing its telecommunications service.

It is undisputed that the County has not previously charged CenturyLink a right-of-way or franchise fee. Yet CenturyLink argues that the fee is prohibitive because it is a "*massive increase*" which would inhibit its ability to provide telecommunications services and compares its situation to the one litigated in *Santa Fe I* and *II*. In *Santa Fe I,* the Tenth Circuit found that a three-fold increase in franchise fee costs from the previous year was sufficient to demonstrate that the fee provisions would create a prohibition under §253. 224 F. Supp. 2d 1305. However, the *Santa Fe* cases distinctly differ on the facts because the increased cost to the carrier was a composite of several different fee charges described in the franchise agreement and not just an increase in the use fee.

In *Santa Fe I,* Qwest (CenturyLink's predecessor) entered into a 1975 franchise agreement where it paid a franchise fee of 2% to the City of Santa Fe in exchange for the right to use any of the City's rights-of-way for purposes of providing telecommunication services to its residents. In 1998, Santa Fe enacted a telecommunications ordinance where carriers must apply for a lease to install new telecommunications facilities or maintain existing ones within the city's rights-of-way. If a lease was granted, the ordinance required that the lessee pay appraisal-based rental fee for its use of the City's rights-of-way–which at the time was $6,000.00 annually—and in addition, dedicate all conduit laid upon the city's property to the city. If a lessee installed new conduit, it was also required to install double the amount of capacity ("excess-capacity requirement") needed for the applicant's own use. The fees enacted under the ordinance in the

*Santa Fe* cases added layers of fees to what Qwest was already paying under the previous franchise agreement. *See SF I,* 224 F.Supp. at 1309 (noting that costs of professional surveys done by Qwest were "in addition to the costs of placing the facility in the right-of-way under the 1975 franchise agreement.").

Under the new Santa Fe ordinance, Qwest was also required to pay for the costs of obtaining leases for all of its supporting infrastructure. Especially noteworthy is that fact that this infrastructure included 365 large "cabinets" that Qwest installed in Santa Fe, thousands of smaller cabinets and pedestals, hundreds of manholes and vaults, and hundreds of miles of cable. 225 F.Supp.2d at 1310. As a result, Santa Fe would be collecting $2,190,000 annually in rental fees for these large cabinets alone and would be collecting rent from Qwest and other telecommunications owners not only for the use of this excess-capacity conduit, but for the use of all conduit previously installed by Qwest which must be dedicated to the City under the terms of the ordinance. Further, Qwest would be incurring a 30% to 59% increase in costs merely to cover the installation of excess-capacity conduit. Not surprisingly, the Tenth Circuit affirmed the majority of the district court's rulings and found that it was "reasonable to infer a massive increase in the company's cost of doing business in Santa Fe as a result of the cumulative effect of the rental fees, appraisal, dedication, and excess-capacity requirements of the City's ordinance."[8] The court concluded that it was sufficient to show that the rental provisions are

_____

[8] In *Santa Fe II*, the Tenth Circuit affirmed lower court in all respects except for its finding that the entire Ordinance was preempted by the Telecommunications Act, since parts of the ordinance that were not preempted could remain in effect. 380 F.3d at 1274. *Santa Fe III* was Qwest's second lawsuit over the City's efforts to alter the fee structure for the use of its public rights-of-way. In *Qwest Corp. v. City of Santa Fe*, Case No. 10cv00617-RB/KLM ("Santa Fe III"), the court issued "Findings of Fact and Conclusions of Law" on December 3, 2013 (Doc. 484) holding that a franchise fee of 3% of gross revenues was preempted by Section 253 where it quadrupled Qwest's prior fee).

prohibitive because they created a massive increase in cost. 380 F.3d 1258, 1271 (10th Cir. 2004).

CenturyLink analogizes its situation under the County's Ordinance to its predecessor's situation in *Santa Fe I* and *II,* arguing that the proposed $212,783.00 "use fee" would be over ten times the permit fees (less than $15,000) which CenturyLink has been paying the County annually. Plaintiff argues that the use fee is a "massive increase" over the permit fee and therefore prohibitive under §253(a). In a 41-page report, Plaintiff's expert economist William Fitzsimmons, Ph.D., notes that the "use fee" is a significant increase over the less than $15,000 in permit fees CenturyLink currently pays the County and that CenturyLink operates in a very competitive telecommunications market in Bernalillo County. Dr. Fitzsimmons concludes from these observations that the use fee will "materially inhibit the ability of CenturyLink to operate in a fair and balanced competitive environment." Ex. 6, ¶7 (Fitzsimmons Rep't.). [9]

Plaintiff characterizes the permit fee as one that is "imposed each time a utility accesses the public rights-of-way," Doc. 145-8 (Baca Decl.), but the County disputes this, noting that the purpose of a permit fee can vary. It also contends that the $212,783.00 franchise fee is a new and separate fee, and not an increased permit fee. The Court agrees with the County that the new use fee cannot be characterized as an *increase* in the permit fee and is thus not a relevant comparison to the franchise fees discussed in the *Santa Fe I* and *II* cases. The Ordinance states that that the County must be "compensated for the reasonable costs involved in the use of the rights-of-way, for administrative expenses incurred in the processing of the necessary permits." Doc. 45, Ex. A. There is no evidence to support Plaintiff's statement that the purpose of the

---

[9]   The Court omits statements from the report that are not relevant or material to the §253(a) analysis, such as Dr. Fitzsimmons' disagreement with the cost methodology used by the County, as well as statements that are not material, such as the statement that CenturyLink's competitors (resale CLECs,VOIP providers, and Comcast) are not subject to the "use fee" and the potential that the "use fee" will be adopted by other counties.

permit fee is to compensate the County for its use of public rights-of-way, as opposed to compensate purely for processing costs for permit applications. Thus, the new use fee must be considered on its own and separate from the permit fee Plaintiff has been paying.

The Court also rejects Plaintiff's position that the new franchise fee is "massive" and therefore prohibitive for several reasons. First, Plaintiff cannot claim something is "massive" simply because it was paying nothing before, and there is no case law that supports such a premise. Under this proposed theory, no governmental entity could impose a new fee of any kind or any amount on a utility or carrier without violating §253(a). There is nothing in the language of §253(a) that precludes an entity from seeking compensation, as long as it does not have the effect of prohibiting the telecommunications services provided by the carrier or utility. As Defendant notes, if CenturyLink were already paying a substantial right-of-way fee, then perhaps even doubling the fee would be deemed materially prohibitive, but that is not the situation here: the franchise/use fee did not exist before the Ordinance was passed.

Second, the increased fees imposed by the new ordinance in *Santa Fe I* and *II* would have quadrupled Qwest's costs of doing business which is in sharp contrast to the franchise fee at issue in this case. In the *Santa Fe* cases, in addition to the appraisal-based rental fee Qwest was already paying, Qwest was also being required to pay other lease fees for hundreds of pieces of infrastructure, some of which would not even be used by Qwest. The franchise fee here under the County's Ordinance is very small by comparison. CenturyLink does not claim that it will quadruple its cost of doing business or cut into 5% of its gross revenue. *Cmp. Puerto Rico Tel. Co. v. Municipality Of Guayanilla*, 450 F.3d 9, 18–19 (1st Cir. 2006) (agreeing with utility that 5% gross revenue fee on its overall profitability would be significant and substantial, and affirming district court's holding that ordinance at issue violates § 253(a)). The annual fee in this

20

case is estimated at $212,783.00 based on a gross revenue from the County in 2013 of $17,563.044.00. The annual fee can therefore be calculated to be one percent (1%) of CenturyLink's gross receipts for the year 2013 ($212,783 divided by $17,563.044).

Third, it is undisputed that CenturyLink already pays a significantly higher fee to the City of Albuquerque than it would be required to pay the County under the Ordinance. Although this fact is not dispositive, it is not entirely irrelevant to Plaintiff's argument that the new cost is "massive."

Fourth, CenturyLink insists that the fee imposition is a "massive increase" but offers little else to meet its burden under §253(a). Plaintiff does not explain how or why the new use fee would effectively or materially prohibit CenturyLink from providing its telecommunications service. While it is not required to specify particular services that would be affected, it is still required to show that the County's Ordinance formally or effectively prohibits its entry into the telecommunications market or prevents it from continuing to provide its services. Except for the payment of a fee it describes simply as "massive," Plaintiff does not describe how the Ordinance mandates unfeasible requirements that forces it to change or suspend any of its services. *Cmp., e.g., AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 390 (1999) (An entrant whose anticipated annual profits from the proposed service are reduced from 100% of investment to 99% of investment has perhaps been "impaired" in its ability to amass earnings, but has not *ipso facto* been "impair[ed] . . . in its ability to provide the services it seeks to offer"); *see also Sprint Telephony PCS v. County of San Diego*, 543 F.3d at 578 ("If an ordinance required, for instance, that all facilities be underground and the plaintiff introduced evidence that, to operate, wireless facilities must be above ground, the ordinance would effectively prohibit it from providing services.").

CenturyLink urges the Court to conclude that the use fee of $212.783.00 has an impact on its profitability, but it provides no evidentiary basis upon which the Court could reach that conclusion.  In fact, the Court could come to the opposite conclusion, based on Plaintiff's own expert who acknowledges that CenturyLink might be more profitable now than in earlier years, despite paying far more substantial fees to the City of Albuquerque.  Ex. J at 228 (Doc. 148-3) ("No, I'm not saying they're losing money . . ." and stating that it was "possible" that Plaintiff was making more money than before).  It is not enough for Plaintiff to claim that funds used for to pay the franchise fee could be diverted elsewhere without describing how the fee payments are impacting its provision of services.  *See, e.g., Level 3*, 477 F.3d at 533-534 ("Level 3 further admits in its response to interrogatories that it 'cannot state with specificity what additional services it might have provided had it been able to freely use the money that it was forced to pay to the City for access to the public rights-of-way [calculated based on occupation footage].'").  Thus, Dr. Fitzsimmons' conclusion that the use fee provision will "materially inhibit the ability of CenturyLink to operate in a fair and balanced competitive environment" is not supported by any relevant material facts.  Ex. 6, ¶7 (Fitzsimmons Rep't.).

Under a §253(a) analysis, CenturyLink bears the burden of establishing that the Ordinance materially inhibits its provision of telecommunications service. *See Sprint Telephony PCS v. County of San Diego*, 543 F.3d at 578; *Level 3 Communications, LLC v. City of St. Louis*, 477 F.3d at 532.  CenturyLink has not done so.  Moreover, CenturyLink has failed to introduce any material facts from which to infer that the County's Ordinance and accompanying Resolution effectively prohibits CenturyLink  from providing its telecommunications services.  Therefore, Defendant is entitled to summary judgment on the fee provisions imposed by the Ordinance.

B.     Non-Fee Provisions

The Ordinance contains non-fee provisions requiring the submission of certain information

for carriers wishing to obtain a right-of-way use agreement:

- Identifying information (name, telephone number, address, place of business of the applicant and his/her engineers and/or contractors);

- A statement of the purpose for the use of the right-of-way;

- A drawing of the location and dimensions of the proposed use, with a plan view and a cross-section view to be submitted for review;

- The method by which the proposed use will be accomplished, including an estimate of the amount of time required to complete any actual work to be performed within the County's right-of-way;

- A map or schematic of utility systems currently occupying the right-of-way; and

- Proof of membership in the New Mexico One Call system.

Doc. 31-1 at 5 (Ordinance, Section 6(A)). The Ordinance further requires entities wishing to

occupy public rights-of-way to submit proof of adequate insurance as well as an indemnification

provision for damages or losses resulting from the intentional or negligent conduct during use of

the County's right-of-way.  *Id.* Section 6 (D) - (E).  The County also reserves the right, after

reviewing the applications, to deny applications or proposed uses of the rights-of-way, or to

impose appropriate terms and conditions.  *Id*. Section 6(H).

CenturyLink claims that there are fact issues as to the prohibitive nature of certain
requirements, specifically:

- detailed mapping information;

- the County's discretion to deny a right-of-way use agreement; and

- the threat of criminal prosecution and removal of CenturyLink's facilities from the public rights-of-way "if CenturyLink does not reach a 'Right-of-Way Use Agreement' with the County"  (Doc. 145 at 20).

Plaintiff contends that these provisions are similar to those that were found to be prohibitive in *Santa Fe I* and *II*, particularly with regard to the "unfettered discretion" given to the County in lease approval and the submission of detailed registration information. The Court agrees with Defendant that the City Ordinance provisions in the *Santa Fe* cases are distinguishable.

The Santa Fe City Ordinance contained provisions that do not exist in the County Ordinance. In the City Ordinance, an entity would be prohibited from providing telecommunications services in Santa Fe unless there was a finding that the lease agreement was "in the best interest of the public." *Santa Fe I,* 224 F. Supp. 2d at 1323. The district court found that such vague and broad requirements were "not limited to right-of-way management or compensation issues" and so gave "essentially unfettered discretion" to the City which fell within the preemptive scope of §253(a). *Id.* at 1325. The court similarly found that the requirement of identification of "such other and further information as may be required by the city" was " vague and open-ended" and had a prohibitory effect. *Id.* at 1324; *Santa Fe II,* 380 F.3d at 1270 ("Such broad discretionary language has been repeatedly held to be prohibitive."). Similar language is not contained in the County Ordinance at issue here.

The amount and scope of the Ordinance's informational requirements are also different from the *Santa Fe* cases. The Santa Fe City Ordinance required, among other things, a description of the transmission medium that would be used by the carrier to offer or provide telecommunications services, detailed preliminary engineering plans and a complex lease application process that included obtaining a rent-based appraisal of the right-of-way. 380 F.3d at 1270. In contrast, the informational requirements in the County Ordinance target information that is reasonable in scope and detail and is related to the management of the public rights-of-way and the impact of a carrier's facility on that right-of-way.

Plaintiff also balks at the criminal penalties included in the Ordinance, but conflates the relevant provisions, making it seem as though criminal prosecution is a penalty even if the carrier fails to reach a use agreement with the County. This is not so. Failure to formalize a specific right-of-way use agreement with the County results in *removal* of the carrier's facilities from the right-of-way, as well as civil penalties, including assessment of expenses resulting from the carrier's failure to perform—but no criminal consequences as a result of a carrier's failure to formalize a use agreement. Doc. 31-1 at 7, Sec. 6(L). Criminal penalties are described only in the provision addressing violations of the Ordinance, such as use of the County property or right-of-way by an unauthorized user or occupier of that property. Doc. 31-1 at 10, Sec. 11. Penalties under this provision include "a fine of not more than $300 or imprisonment for not more than 90 days or both, per violation." *Id.*

Plaintiff contends that courts have found criminal penalties to be preempted under §253 as improper right-of-way management, relying on a District of New Mexico case. In *Bd. of Cty. Comm'rs of Grant Cty., New Mexico*, Senior District Judge John E. Conway concluded that the county's ordinance which authorized "substantial civil and criminal penalties for noncompliance with the application process" had the effect of prohibiting the provision of telecommunications services under §253(a). 169 F. Supp. 2d 1243, 1249 (D.N.M. 2001) ("*Grant County*"). However, as Defendant points out, the court recognized that penalty provisions like those contained in the Grant County ordinance were not prohibitive per se, but rather found that the provisions included "several features that, if not alone, certainly in combination have the effect of prohibiting the provision of telecommunications services under § 253(a)." 169 F.Supp.2d at 1249 ("[I]t does not automatically follow that all enforcement provisions are preempted on their face. To determine

whether each provision is lawful, the court must examine the nature of the penalty, and the wrong the penalty seeks to prevent or punish.").

The application process in the *Grant County* case required applicants "to provide extensive information regarding everything from names, numbers, affiliations and stock holdings of officers and directors, to agreements with other utilities, and financial statements." That ordinance also provided for the imposition of civil and criminal penalties in amounts up to $50,000 per violation per day for any entity or person which does not comply with the terms of that ordinance, as well as a provision making fines, penalties and forfeitures cumulative.[10]  169 F.Supp.2d at 1247.  In contrast, the Bernalillo County Ordinance lacks the more draconian features of the Grant County ordinance. The criminal penalties for unauthorized use of rights-of-way are much less severe, and the civil penalties related to the finalizing of use agreements are not unlike measures one would expect to find in certain contract situations. The County is within its rights under the Telecommunications Act to seek compensation for the use of its rights-of-way.  *See Santa Fe II,* 380 F.3d at 1269 (noting that 47 U.S.C. § 253(c) "preserves the power of municipal authorities to manage rights-of-way and to require compensation for the use of the rights-of-way").  The penalties set out in the Ordinance appear to be tailored to the management of public rights-of-way for situations involving telecommunications carriers which have existing facilities in rights-of-way but which fail to finalize a use agreement with the County.

Plaintiff also challenges the breadth of discretion given to the County under the Ordinance, again comparing its provisions to those described the *Santa Fe* cases.  The Court agrees with the County in that the discretion given to the City of Santa Fe in those cases was much broader and

---

[10] *See Bd of Cty Comm'rs of Grant County et al v. U.S. West Communications, Inc.,* 98-cv-01354 JEC-LFG, Doc. 66 at 2 ( 6/26/00 ).  In this earlier decision, Judge Conway, held that the ordinance and the application form were preempted under the Telecommunications Act.  The decision cited above at 169 F.Supp.2d 1243 contains the court's rulings following the carrier's request for the court to address additional sections of the franchise ordinance.

nonspecific. Here, there is no "best interests of the public language" and the discretion is specific to the use and management of the public right-of-way. *See* Doc. 31-1 at 6, Sec. 6(H) ("The County expressly reserves the right to determine whether the application or the proposed uses of the County's right-of-way are sufficient and suitable to be incorporated into a Right-of-Way Use Agreement, and also expressly reserves the right to mandate any other conditions and terms as the County deems necessary."). The County does have considerable discretion in deciding whether the proposed uses are appropriate, but the mere existence of some discretion on the part of the County does not establish prohibition of CenturyLink's ability to provide services, as observed by the Ninth Circuit:

> A certain level of discretion is involved in evaluating any application for a zoning permit. It is certainly true that a zoning board could exercise its discretion to effectively prohibit the provision of wireless services, but it is equally true (and more likely) that a zoning board would exercise its discretion only to balance the competing goals of an ordinance--the provision of wireless services and other valid public goals such as safety and aesthetics.

*Sprint Telephony PCS v. County of San Diego*, 543 F.3d 571 at 580.

Here also, Plaintiff has raised no genuine issues of facts from which a reasonable fact finder could find that the non-use provisions effectively or materially prohibit CenturyLink from providing telecommunications services. Defendant is therefore is entitled to summary judgment on Plaintiff's challenges to the non-use provisions of the Ordinance.

C.    Design Review Fees

The other category of provisions challenged by Plaintiff is the Design Fee Resolution imposes a $750 fee for the design review of utility construction drawings (raised from an initial $250.00) where construction costs were under $250,000, and a fee of 1.5% of the construction costs for costs over $250,000. Doc. 45 at 32. CenturyLink does not challenge the $750 fee, but complains about the percentage-based fee for larger projects and contends this fee is effectively

prohibitive because it constitutes a massive increase without any cost support. Plaintiff states that it often has projects in excess of $250,000.00, and the imposition of this fee will exceed the four-fold increase the Tenth Circuit has considered to be massive, once the construction costs exceed $250,000.00. For example, a project cost of $250,001.00 would require a Design Review Fee payment of $3,750 ($250,001.00 x 1.5%), which Plaintiff calculates is 15 times greater than the *original* fee of $250.00 and 5 times greater than the new cost-based fee of $750.00. However, Plaintiff's "massive increase" argument is illusory for two reasons. First, it measures the cost of more expensive projects against a base cost that no longer exists, where the comparison should be based on the new cost-based $750.00 with which Plaintiff has no issue; and second, Plaintiff uses the $250,000.00 figure from which to calculate an "increase" without comparing it to an earlier upcharge for larger projects, making the increase look deceptively large. To illustrate, had the County decided to charge a 1.5% design review fee for projects that are over $50,000.00 (as opposed to $250,000.00), Plaintiff's fee would be $1,500.00 instead of $3,750.00. Plaintiff would have actually had to pay higher design fees for less expensive projects, even though the increase would not seem so "massive."

Defendant puts Plaintiff's "massive increase" argument in perspective, explaining that it does not apply in the case of a small fee like the Design Review fee. A fee for projects costing about $250,000.00 would start at $3,750.00 and the fee for a project twice that costly would be about $7,500.00. CenturyLink claims it "often" has projects in excess of $250,000.00 without any supporting evidence pertaining to either past or expected future projects of this magnitude. Thus, there are no facts suggesting that Plaintiff's design review fees will not be kept at manageable and nominal sums, and likewise no facts suggesting that these particular Ordinance

provisions are prohibitive under §253(a). Summary judgment is therefore granted to Defendant on Plaintiff's challenges to the design review provisions.

## II.     Whether the Ordinance and Resolutions Comes within the Safe Harbor of §253(c)

The second part of the two-part test under §253(c) must be considered only if an ordinance or regulation is found to be prohibitive under §253(a). *See Sprint Telephony PCS*, 543 F.3d at 578 ("In other words, if the provision is not prohibitive, there is no preemption under § 253"); *Santa Fe II,* 380 F.3d at 1269 (if regulation is found to be prohibitive, the second part of the test is applied to determine whether the regulation may be saved from preemption under §253(c).

In conducting its analysis under §253(a), the Court has found that the challenged Ordinance provisions (that is, the fee provisions, the non-fee provisions and the design review fees) are not prohibitive under §253(a) and do not violate 47 U.S.C. § 253.  Accordingly, further analysis under §253(c) is not necessary.[11]

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint **(Doc. 142)** is hereby GRANTED for reasons described in this Memorandum Opinion and Order, with the Court finding that the Ordinance and Resolutions do not violate 47 U.S.C. § 253, and that Defendant is entitled to summary judgment on Count II of the Second Amended Complaint.

---

[11] The Court recognizes that many of the facts in the background section are relevant to a §253(c) analysis, such as those facts concerning the Count's cost study or to the methodology used in the study.  However, if there are any disputes of fact on those issues, they are rendered moot with the Court's ruling herein that the Ordinance provisions do not violate §253(a).

Dismissal of Count II effectively disposes of this entire matter, and a Rule 58 Judgment shall be entered separately.

_____
CHIEF UNITED STATES DISTRICT JUDGE